**IN THE UNITED STATES DISTRICT COURT**
**THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

| | | |
|---|---|---|
| JOSEPH KAPUCHUCK,<br><br>Plaintiff<br><br>v.<br><br>ROCKINGHAM COUNTY SCHOOL BOARD,<br><br>ASHLEY BURGOYNE, in her individual and official capacity,<br><br>HOLLIE CAVE, in her individual and official capacity,<br><br>MATTHEW CROSS, in his individual and official capacity,<br><br>SARA HORST, in her individual and official capacity,<br><br>JACKIE LOHR, in her individual and official capacity,<br><br>and<br><br>LARRY SHIFFLETT, in his individual and official capacity,<br><br>Defendants. | ) | Case Number: 5:26-cv-00112<br><br>**JURY TRIAL DEMAND** |

**AMENDED COMPLAINT**

Plaintiff Joseph Kapuchuck states the following as his Amended Complaint against Defendants Rockingham County School Board, Ashley Burgoyne, Hollie Cave, Matthew Cross, Sara Horst, Jackie Lohr, and Larry Shifflett, in their individual and official capacities.

**JURISDICTION AND VENUE**

1. This action arises under the Constitution and laws of the United States, including the Fourteenth Amendment, the First Amendment, 42 U.S.C. § 1983, and state contract and tort law.

2. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and §§ 1343. This Court has supplemental jurisdiction over the additional state law claims pursuant to 28 U.S.C. § 1367.

3. This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and §§ 2202.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district, and Defendants reside or conduct business in this district.

**PARTIES**

5. Plaintiff, Joseph Kapuchuck, ("Kapuchuck" or "Plaintiff") is an adult resident of Rockingham County, Virginia. Kapuchuck was employed by Defendant Rockingham County School Board and, at all relevant times, served as the Principal of Peak View Elementary School ("PKVES") for Rockingham County Public Schools in Rockingham County, Virginia. At all relevant times, Plaintiff was employed under the authority of Defendant Rockingham County School Board.

6. Defendant Rockingham County School Board ("RCSB") is a public body corporate, organized under the laws of the Commonwealth of Virginia and responsible for the governance, operation, and supervision of Rockingham County Public Schools ("RCPS" or the "Division"). At all relevant times, RCSB was responsible for establishing, approving,

implementing, and enforcing policies, customs, practices, and procedures governing the employment, discipline, investigation, suspension, and dismissal of licensed educational personnel within the Division. At all relevant times, RCSB possessed final policymaking authority with respect to the discipline and termination of licensed employees, including Plaintiff. The acts described herein were carried out pursuant to the Board's decisions, policies, customs, ratification, and/or the actions of officials possessing final policymaking authority.

7. Defendant Ashley Burgoyne ("Defendant Burgoyne") is an adult residing in Rockingham County, Virginia, and at all relevant times herein served as a member of RCSB. At all relevant times herein, Defendant Burgoyne was acting under color of state law. Defendant Burgoyne is sued in her individual and official capacity.

8. Defendant Hollie Cave ("Defendant Cave") is an adult residing in Rockingham County, Virginia, and at all relevant times herein served as a member of RCSB. At all relevant times herein, Defendant Cave was acting under color of state law. Defendant Cave is sued in her individual and official capacity.

9. Defendant Matthew Cross ("Defendant Cross") is an adult male who resides in Rockingham County, Virginia, and at all relevant times herein served as a member and/or as Chair of RCSB. At all relevant times herein, Defendant Cross was acting under color of state law. Defendant Cross is sued in his individual and official capacity.

10. Defendant Sara Horst ("Defendant Horst") is an adult residing in Rockingham County, Virginia, and at all relevant times herein served as a member of RCSB. At all relevant times herein, Defendant Horst was acting under color of state law. Defendant Horst is sued in her individual and official capacity.

11. Defendant Jackie Lohr ("Defendant Lohr") is an adult residing in Rockingham County, Virginia, and at all relevant times herein served as a member of RCSB. At all relevant times herein, Defendant Lohr was acting under color of state law. Defendant Lohr is sued in her individual and official capacity.

12. Defendant Larry Shifflett ("Defendant Shifflett" or the "Superintendent") is an adult male who resides in Rockingham County, Virginia. At all relevant times herein, Defendant Shifflett was the Division Superintendent and was acting under color of state law. Defendant Shifflett is sued in his individual and official capacity.

**FACTS**

13. Kapuchuck was employed by RCSB at RCPS beginning January 1, 2013.

14. Kapuchuck first held the role of Principal within the Division, beginning July 1, 2015, at Plains Elementary School.

15. As of July 1, 2018, Kapuchuck achieved continuing contract status as a principal for purposes of Virginia Code § 22.1-294 and all the protections afforded to such status.

16. Kapuchuck signed and submitted his contract for the 2024-2025 school year on May 23, 2024.

17. As a continuing contract Principal, Kapuchuck's employment could only be terminated for cause. At the time Defendants terminated Kapuchuck's employment, his contract implicitly included the rights afforded by Virginia Code § 2.2-304(B) ("Teachers employed after completing the probationary period shall be entitled to continuing contracts during good behavior and competent service.").

18. Effective July 1, 2021, Kapuchuck became Principal of PKVES, where he remained until his employment ended in August 2024.

19. Kapuchuck has an unblemished employment record, with no history of disciplinary action, negative evaluations, or performance concerns.

20. Kapuchuck consistently received positive evaluations throughout his tenure with RCPS.

21. On February 16, 2023, a special education assistant reported to the Assistant Principal an incident involving RCPS Teacher Elizabeth "Beth" Davis ("Davis"). The Assistant Principal forwarded the message to Kapuchuck. Kapuchuck monitored the situation to ensure it was addressed, and in fact, it was addressed as was confirmed when the Assistant Principal later reported to Kapuchuck that he had addressed the incident with the special education assistant and Davis on February 17, 2023, thus taking care of the matter. Based on what was reported at the time, neither the Assistant Principal nor Kapuchuck considered the incident to involve abuse or neglect.

22. Additional complaints were made by other special education assistants who worked with Davis. The complaints were about Davis being hard to work with, her organization, and her classroom management. The complaints reported to the Assistant Principal and Kapuchuck did not concern abuse or neglect.

23. On February 24, 2023, Kapuchuck convened a meeting with the Director of Special Education ("SPED"), Melissa Bentley ("Director Bentley"), and all special education assistants so that the SPED assistants had an opportunity to speak with the Director about any concerns they had and to receive guidance. During this meeting, several concerns regarding Davis were raised regarding alleged abuse and neglect. Kapuchuck had no prior knowledge of these complaints.

24. Multiple licensed staff and central office personnel, including Kapuchuck, had previously observed Davis's classroom and noted no instances of abuse or neglect.

25. Based on the new information, immediately following the February 24, 2023 meeting, with Kapuchuck in the loop, Director Bentley consulted with central administration of RCPS and was instructed to contact Child Protective Services ("CPS") regarding Davis.

26. CPS was thereafter contacted, and both Kapuchuck and Director Bentley followed all directives provided by central office administrators and the Division's Human Resources Director, Michele Judd ("HR Director Judd").

27. On March 2, 2023, Human Resources provided direction on procedural matters concerning both Davis and the ongoing investigation into her alleged actions and/or inaction. Kapuchuck and Director Bentley were given questions to ask Davis as part of their investigation, and the questions covered several things, including the allegations that had been made against Davis in the February 16, 2023 email to the Assistant Principal.

28. In accordance with the direction from HR, on March 7, 2023, Kapuchuck conducted a formal observation of Davis, carefully ensuring no investigative details were disclosed, as she was unaware of the allegations at that time. Kapuchuck did not observe any acts of abuse or neglect.

29. Thereafter, Kapuchuck and Director Bentley interviewed Davis as part of their investigation, asking the questions provided by HR.

30. On March 28, 2023, Kapuchuck and Director Bentley met with central office leadership, including Defendant Shifflett, Assistant Superintendent Doug Alderfer ("Alderfer"), and HR Director Judd, and presented investigative findings, including discussing the investigative notes of CPS Investigator Dolph and CPS employee Novotone, who had interviewed the special education assistants.

31. Davis was placed on leave and ultimately never returned to PKVES as an employee.

32. At this time, at the very least, Defendant Shifflett, Assistant Superintendent Alderfer, HR Director Judd, and Director Bentley, were all aware of the February 16, 2023 allegations, including Kapuchuck's actions related thereto. Neither Defendant Shifflett, Assistant Superintendent Alderfer, HR Director Judd, Director Bentley, nor anyone within central office administration raised any concerns regarding Kapuchuck's fulfilment of any reporting obligations or any other obligations under law or policy during the March 28, 2023, meeting, or thereafter.

33. Instead, in June of 2023, Kapuchuck received a positive performance evaluation in which Assistant Superintendent Alderfer commended Kapuchuck with regard to this event by stating "Jay also worked through a very challenging personnel issue at his school. Throughout the process Jay was attentive to the needs of the students, parents, and staff as he worked through this confidential process."

34. Similarly, in December of 2023, Assistant Superintendent Alderfer wrote a glowing recommendation for Kapuchuck to be considered for the National Distinguished Principal Program, equivalent to Virginia's Principal of the Year Award. In his recommendation, he said of Kapuchuck, "I can honestly say that Mr. Kapuchuck is one of the most dedicated, hardworking, and child centered people I know, not only within our school division, but in my entire circle of professional contacts. He is a tireless worker and committed educator. He possesses all of the qualities required from someone to be considered a Nationally Distinguished Principal."

35. Not long thereafter, Kapuchuck also successfully hired a new Assistant Principal, along with all other new licensed and classified staff, for the 2024-2025 school year for PKVES.

36. In July 2024, Kapuchuck was also honored when he was chosen to be the President of the Rockingham County Principals and Supervisors Association.

37. In May of 2024, Davis was criminally tried on three charges of child cruelty and two charges of abduction involving three elementary school students with autism. None of the criminal charges arose from the incident reported to the Assistant Principal on February 16, 2023.

38. Davis pleaded not guilty to all charges.

39. Davis's criminal trial lasted for three days.

40. The trial was a matter of public interest in the community, and a source of public discussion and debate. The media covered her preliminary appearance in court on the charges.

41. Local media outlets provided intensive coverage of the trial, including daily recaps of witness testimony, including Kapuchuck's testimony.

42. The prosecution put on 15 witnesses, including several school employees who spoke negatively about Davis.

43. The defense put on approximately 10 witnesses, including school employees who testified positively about Davis.

44. Kapuchuck was subpoenaed to testify in the criminal trial by Davis's lawyer.

45. Kapuchuck was not involved in Davis's defense strategy and had no control over who the defense called to provide testimony.

46. Kapuchuck testified truthfully that he had been in Davis's classroom on multiple occasions and never noted any concerns about Davis's conduct toward her students.

47. Kapuchuck further testified truthfully that Davis was an effective teacher who had been praised in a staff review for handling a difficult situation well and helping students to grow.

48. At the conclusion of evidence, the court struck the child cruelty charges, and the jury acquitted Davis of the abduction charges. While none of the criminal charges arose from the incident reported to the Assistant Principal on February 16, 2023, the jury was permitted to hear

about that day as Davis was asked questions by the prosecution related to the same. With this evidence, the court struck the child cruelty charges, and the jury acquitted Davis on the remainder charges.

49. Following the acquittal on May 30, 2024, there was significant backlash within the community, including public demonstrations regarding the outcome of the jury trial.

50. Defendant Cross was publicly vocal on social media, in conversation outside of RCSB activities, and in meetings related to RCSB activities in expressing his displeasure with the acquittal and made it clear that he deeply disapproved of any individual who participated in Davis's defense.

51. At least three signs were posted in the school declaring support for the employees who had testified against Davis, and vitriol for those who testified in Davis's defense. Pictures of the signs were picked up and distributed on social media pages. A picture of one such sign follows:



52. Staff expressed to Kapuchuck that they were uncomfortable working in the building because they had either testified against or for Davis. Staff members accused those who testified for the defense of lying under oath. Members of the parent body contacted Kapuchuck by phone and in writing to express their feelings about the outcome of the trial.

53. Defendant Cross publicly displayed support for individuals who testified against Davis. For example, in mid-August 2024, not long before Plaintiff's employment was terminated, Defendant Cross showed up at PKVES, both during teacher workdays and when students were in school, and was seen by Jackie Stenson, PKVES Secretary, with his arms around the assistants and teacher who testified against Davis. One of the assistants stated to Stenson, "We're not done yet."

54. Defendant Cross often used social media directly or shared information from School Board closed-session discussions and minutes with his followers. Those followers would then post or repeat the information on social-media platforms. This created public discussion and dissemination of allegations concerning Kapuchuck, including allegations that Kapuchuck failed to report suspected child abuse and failed to fulfill professional obligations.

55. By way of example, Jocelyn White Hinegardner posted that Defendant Cross "fired a principal who was covering up the abuse of a non-verbal verbal student when two other school board members wanted to only 'let him resign' so he could be hired back into the county system. Cross stood firm, as did 2 other SB members and fired him[.]" The principal referenced is Kapuchuck. Ms. Hinegardner would not have had this information from a closed session meeting but for Defendant Cross relating it to her.

56. By way of another example, Defendant Cross posted, "If you don't want transparency, students and staff to be held accountable, or school safety, then I'm not your

candidate. My opponent gives gifts to people who don't do their jobs. I on the other hand will fire you. I put your child's safety first." The individual who is alleged to have not done their job is Kapuchuck.

57. The "opponent," Hilary Irons, and Kapuchuck were then further chastised on social media by Brooke Webster Garrison as follows, "Why did you want to buy a principal *fired for not addressing reported harassment of teacher on non-verbal students* a gift from PTO?". As Irons pointed out in response, the information regarding Kapuchuck could have only been known by Garrison if a RCSB member violated their duty to keep closed session information private.

58. Less than two weeks after the acquittal, Defendant Shifflett advised Kapuchuck on June 12, 2024, that the school board had directed Defendant Shifflett to conduct investigations into Davis. Then, on August 9, 2024, Defendant Shifflett told Kapuchuck that during that same period he had also investigated Kapuchuck's conduct in February 2023 related to the allegations against Davis. At no point during the intervening 17 months had any investigation occurred related to Kapuchuck's conduct and no concerns were raised about his conduct, despite his actions related thereto being known.

59. The investigation into Kapuchuck was initiated at the request of RCSB, where Defendant Cross sat as Chair. The investigation was conducted by Defendant Shifflett, Defendant Cross and Defendant Cave, with both board members sitting in on interviews with school employee witnesses.

60. It is highly unprecedented and improper for RCSB members to be involved in a personnel investigation. Under Virginia law, a school board is the entity who ultimately decides the outcome of a grievance brought resulting from a personnel investigation. After a continuing contract licensed staff member is notified of his immediate supervisor's recommendation

regarding the outcome of an investigation, that staff member has a certain period in which to elect a hearing in front of the school board under the grievance procedure. During that period, it is illegal for the school board to take any action on the recommendation or even be briefed on the recommendation or the reasons for it. Thus, it is an extreme conflict of interest for a board member to conduct the investigation leading to the recommendation and then be the arbiter of any grievance that arises from that recommendation.

61. Eschewing these principles and the law, Defendants Cross, Cave, and Shifflett selectively interviewed employees, focusing only on individuals who had testified against Davis or had prior conflicts with her, and ignoring employees who had testified positively about Davis. Kapuchuck was neither provided with notice of any specific allegations against him, nor was he given a meaningful opportunity to respond to the allegations. He was never even interviewed. On information and belief, Assistant Principal Mongold was not interviewed either.

62. Assistant Superintendent Alderfer also cancelled Kapuchuck's yearly evaluation scheduled in June 2024 and never rescheduled it.

63. Kapuchuck's conduct concerning the complaints raised about Davis in February 2023 was entirely appropriate, as confirmed by the fact that he was not counseled by his employer, reprimanded by his employer, or disciplined in any way by his employer during the 15 intervening months between February 2023 and the Davis acquittal. Defendant Shifflett supervised Kapuchuck during those intervening months and was involved in all investigations into Davis, including the reports made about Davis. At no time during those 15 months did Defendant Shifflett even criticize how Kapuchuck handled his part in the Davis events that occurred in February-March of 2023. Further, Kapuchuck was not referred to Child Protective Services for any of his conduct

surrounding the complaints made about Davis, investigated by law enforcement, or subject to any civil complaint, as there was no basis to do so.

64. Rockingham County Commonwealth Attorney Marsha Garst, CPS Supervisor Tammi Craver, and HR Director Judd reviewed the information gathered and indicated that Kapuchuck had done nothing wrong.

65. Kapuchuck heard nothing else about the investigation being conducted by Shifflett and the board until Friday, August 9, 2024, when he was called into a meeting with Defendant Shifflett and Assistant Superintendent Alderfer.

66. Approximately 15 minutes after Kapuchuck was called to this meeting, Defendant Cross was seen at PKVES by Jackie Stenson, PKVES Secretary, speaking with the Assistant Principal.

67. During the meeting, Defendant Shifflett informed Kapuchuck that he intended to recommend to RCSB that Kapuchuck be dismissed for his alleged failure to report the incident involving Davis that occurred on February 16, 2023, as well as allegedly failing to address performance concerns with Davis.

68. Further, Defendant Shifflett told Kapuchuck that if he chose to resign instead of going to a school board hearing through the grievance procedure that he was entitled to under law, he would be permitted to resign and leave with some severance and with his reputation intact. If he did not resign, he would face termination proceedings and there would be a public record of his termination from employment.

69. Defendant Shifflett's offer of resignation under these circumstances is commonplace in the Virginia education setting, and Kapuchuck was familiar with the practice based on the recommended dismissals he had been a part of over his career. If he was permitted to

resign, and did resign, he would not have to disclose to other school districts he applied to in the future that he had been subject to dismissal, a question that is asked by the majority, if not all, of the school districts in Virginia.

70. There was nothing unusual about the Superintendent being the person to relay the offer of resignation. It is in fact common for it to be the Superintendent who relays an offer of resignation to a personnel member, as the Superintendent works closely with the board on personnel matters and is regularly delegated this authority by the board.

71. As a long-standing educator and principal in Virginia, Kapuchuck knew that if he resigned his employment, he would be giving up his right to challenge the recommended dismissal through the grievance process. But, in exchange, as confirmed by Defendant Shifflett, he would have the benefit of a resignation instead of a termination on his record, a neutral reference from RCSB to any prospective employers, and, depending on when he resigned, some severance.

72. Defendant Shifflett's representation regarding permitting resignation is significant in the Virginia education setting, because according to law, the resignation of a licensed staff member during a contract period is only complete upon the board accepting the resignation.

73. Thus, when Defendant Shifflett offered a permitted resignation to Kapuchuck, it was reasonable for Kapuchuck to believe that the resignation would be accepted by the board, and Kapuchuck could avoid the serious reputational harm he would suffer from having to disclose in the future that he had been dismissed from his employment. If that were not the case, Defendant Shifflett wouldn't have made the offer.

74. During this August 9, 2024, meeting, and without prior notice to Kapuchuck, RCSB shut down his access to his school email, entry codes, and other Division systems, thereby

removing any access Kapuchuck could have to consider his defense to the intended recommendation of dismissal.

75. On August 12, 2024, Defendant Shifflett sent a notice of proposed dismissal to Kapuchuck and held a meeting in the PKVES cafeteria, wherein he told staff that Kapuchuck was on leave, told them not to contact Kapuchuck, and relayed a story about a fable, stating, "Which part of the elephant are you holding?". After speaking to the staff, Defendant Shifflett went into the PKVES office and met with Defendant Cross behind closed doors in Kapuchuck's former office, as witnessed by PKVES office personnel.

76. It is not unusual that the notice of proposed dismissal did not include the offer of resignation as the purpose of the notice is to fulfill a legal requirement, not to propose resolution.

77. On August 26, 2024, Kapuchuck tendered his resignation as Principal of PKVES, relying on Defendant Shifflett's representation that Kapuchuck was permitted to resign as an alternative to grieving the recommendation.

78. Contrary to what had been promised, Defendants RCSB and Defendant board members did not accept the resignation. Instead of notifying Plaintiff that the resignation had been rejected, which would have allowed Kapuchuck the time to file a grievance as the 10-day business period had not elapsed, Defendants RCSB and Defendant board members prematurely acted on the recommendation and terminated Kapuchuck's employment. Kapuchuck was not notified that his employment had been terminated until the next day, at which point his window to file a grievance had closed. After he found out his employment had been terminated, Kapuchuck requested that he be permitted to file a grievance late considering he never would have given up his right to file a grievance if he had known the resignation would be rejected, but Defendants denied his request.

79. Defendant Cross seconded the motion to fire Kapuchuck and threatened the other members of RCSB that if they did not vote to terminate Kapuchuck, Defendant Cross would make their lives miserable during their remaining terms as School Board members. School Board Member Jackie Lohr informed individuals in the community that Matt Cross threatened them that if they did not vote to terminate Kapuchuck, Defendant Cross would make their lives miserable during their remaining terms as School Board members.

80. Defendants' actions illustrate intentional malice or reckless indifference to Kapuchuck's rights.

81. Indeed, the administrative investigation into Kapuchuck, which occurred more than a year after the February 16, 2023, incident involving Davis, and which hinged on specially-selected witnesses while excluding exculpatory evidence, was really a sham process designed to offer cover to Defendants to terminate Kapuchuck's employment, in blatant violation of his rights.

82. The termination of Kapuchuck's employment from RCSB had a devastating impact on his financial position and caused drastic reputational damage as an otherwise accomplished, education professional.

83. Being that educators seeking employment in the Commonwealth of Virginia must answer on employment applications whether they have ever been terminated from employment in the education sector, Kapuchuck must answer "yes" that he has been terminated since the School Board fired him instead of accepting his resignation.

84. Many, if not most or all, divisions across jurisdictions in the Commonwealth look unfavorably upon termination histories of prospective employees and automatically reject applicants who have a mark of termination in their employment records.

85. Kapuchuck applied to over fifty job postings at divisions around the Commonwealth before gaining re-employment, in a teaching position. To date, despite continued application, Kapuchuck has not received an offer for an administrator role. The salary discrepancy between a teaching position and an administrator position has required Kapuchuck to work an additional job in the evenings and on the weekends on top of teaching, and he still earns far less than what he was earning as the Principal of PKVES. The results of these financial losses cannot be understated in terms of his retirement contributions, providing for his family, and being deprived of time with them while he works two jobs to provide support.

86. Kapuchuck has suffered economic loss, other compensatory damages, pain and suffering, mental anguish, emotional harm, embarrassment, personal humiliation and reputational harm as a result of the Defendants' actions.

## COUNT I
### *Procedural Due Process*
### *42 U.S.C. § 1983*
### *Against all Defendants*

87. Plaintiff realleges and incorporates by reference all preceding paragraphs.

88. The Fourteenth Amendment of the United States Constitution prohibits the deprivation of a property interest without due process of law.

89. Under 42 U.S.C. §1983, Plaintiff may bring a claim against those acting under color of state law to deprive him of his rights under the Fourteenth Amendment of the United States Constitution.

90. At all relevant times, Plaintiff possessed a constitutionally protected property interest in his continued employment as Principal of PKVES arising from Virginia law, including Va. Code §§ 22.1-294 and 22.1-304, Division policies, and his status as a principal with a continuing contract.

91. Defendants, acting under color of state law, deprived Plaintiff of this protected property interest when Defendant Shifflett misrepresented to Plaintiff that he could resign, which Plaintiff relied upon and, as a result, gave up his opportunity to grieve the recommended dismissal, only to have his resignation rejected by RCSB.

92. As alleged *supra*, Defendant Shifflett told Plaintiff that Defendant Shifflett was going to recommend that Plaintiff be dismissed from employment, but if Plaintiff chose to resign instead of challenging the dismissal, Plaintiff could leave with his reputation intact, and depending on when he resigned, some severance.

93. As Superintendents are regularly delegated the authority by school boards to make this type of offer, it was reasonable for Plaintiff to believe that RCSB would accept his resignation.

94. Based on this representation, it was reasonable for Plaintiff to rely on the fact that if he tendered his resignation, it would be accepted, and he would leave the division with his reputation intact.

95. The representation that Plaintiff could resign and leave the division with his reputation intact, was false, as once Plaintiff tendered his resignation, RCSB and Defendants Burgoyne, Horst and Lohr rejected it and summarily fired him, and the termination of his employment is a matter of public record in RCSB Board Minutes and one he must disclose to any future education employer. Further Defendants Cave and Cross acted to cause the termination. While on paper they abstained from the vote, as set forth above, both Cave and Cross engaged in a biased "investigation" to create a pretextual reason to terminate Kapuchuck's employment and then threatened the remaining Board members that there would be adverse consequences if they did not vote to reject Kapuchuck's resignation and terminate his employment. Cross further seconded the motion.

96. As a result of the misrepresentation, Plaintiff gave up his right to challenge the dismissal. Defendants' conduct prevented Plaintiff from making a free and informed choice, which deprived Plaintiff of his protected property interest.

97. Defendants also violated Plaintiff's due process rights when they considered and acted on the recommendation to dismiss Plaintiff before the period in which Plaintiff was permitted to file a grievance elapsed. Instead of notifying Plaintiff that the board had rejected the resignation, and allowing him the remainder of his statutory period to file a grievance, Defendants terminated Plaintiff's employment prematurely and then hid that fact from Plaintiff until it was too late for him to file a grievance.

98. RCSB, as comprised by its individual board members, is responsible for all policy making for the division, is the final decision-making authority on division matters including but not limited to personnel matters, and is the executing body of those decisions. In this case, the unconstitutional actions could not have occurred but for RCSB's involvement in the decision and execution of that decision. Thus, RCSB and its board members are liable to Plaintiff for the deprivation of his constitutional rights as set forth in this claim, pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

99. As a proximate cause of Defendants' violation of Plaintiff's rights, Plaintiff has suffered economic loss, other compensatory damages, pain and suffering, mental anguish, emotional harm, embarrassment, personal humiliation and reputational harm.

## COUNT II
*Violation of Liberty Interest*
*42 U.S.C. § 1983*
*(Against Defendants RCSB and Cross, in his individual and official capacity)*

100. Plaintiff realleges and incorporates by reference all preceding paragraphs.

101. The Fourteenth Amendment of the United States Constitution protects an individual's liberty interest in his reputation, good name, honor, and integrity, as well as his freedom to pursue his chosen profession.

102. Under 42 U.S.C. §1983, Plaintiff may bring a claim against those acting under color of state law to deprive him of his rights under the Fourteenth Amendment of the United States Constitution.

103. Defendants publicly and falsely accused Plaintiff of serious professional misconduct, including failure to report suspected child abuse and failure to fulfill his professional obligations.

104. These allegations are of a nature that would seriously damage Plaintiff's standing and associations in the community and foreclose his ability to obtain comparable employment in his profession.

105. Defendants disseminated these allegations within the Division, to the School Board, and to the public.

106. Defendants further deprived Plaintiff of his right to clear his name when Defendants rejected Plaintiff's resignation, prematurely terminated his employment, and hid from Plaintiff that fact that his employment had been terminated until after his period to file a grievance elapsed.

107. As a result of these actions, Plaintiff has faced incredible difficulty in securing comparable employment in education administration and has suffered substantial reputational harm.

108. RCSB, as comprised by its individual board members, is responsible for all policy making for the division, is the final decision-making authority on division matters including but not limited to personnel matters, and is the executing body of those decisions. In this case, the

unconstitutional actions could not have occurred but for RCSB's top official, Defendant Cross, chair of RCSB, disseminating to the public, false charges against Kapuchuck. Thus, RCSB is liable to Plaintiff for the deprivation of his constitutional rights as set forth in this claim, pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

109. Accordingly, Defendants deprived Plaintiff of his liberty interest without due process of law.

110. As a proximate cause of Defendants' violation of Plaintiff's rights, Plaintiff has suffered economic loss, other compensatory damages, pain and suffering, mental anguish, emotional harm, embarrassment, personal humiliation and reputational harm.

COUNT III
*Retaliation for Exercising First Amendment Rights*
*42 U.S.C. § 1983*
*(Against all Defendants)*

111. Plaintiff realleges and incorporates by reference all preceding paragraphs.

112. The First Amendment to the United States Constitution protects, among other things, free speech.

113. Under 42 U.S.C. §1983, Plaintiff may bring a claim against those acting under color of state law to deprive him of his rights under the Fourteenth Amendment of the United States Constitution.

114. Plaintiff engaged in activity protected under the First Amendment to the United States Constitution when he testified truthfully under subpoena in Davis's criminal trial.

115. Plaintiff's testimony constituted speech on a matter of serious and grave public concern because it was elicited in a trial about whether public school students with special needs had been abused while in school. That it was a matter of public concern, is further borne out by the allegations *supra*, including but not limited to, that the trial was followed closely by the

community, it was reported on the news, and the outcome was the subject of public debate and demonstration.

116. Plaintiff's interest in speaking on the issue outweighs the government's interest in providing efficient services. Plaintiff testified truthfully, in good faith, and his speech was not false or erroneous, and Plaintiff did not break confidence by testifying. Plaintiff was one of many witnesses who testified in the highly publicized trial of Davis; Plaintiff's speech occurred outside of his job duties and had no bearing on Defendants' interest in providing efficient services.

117. Within three weeks of Plaintiff testifying, Defendants, acting under color of state law, took adverse employment action against Plaintiff by opening a sham investigation into his conduct from a prior school year, 15 months in the past. The investigation was conducted at the behest of Defendant RCSB by Defendant Shifflett and Defendant board members Cross and Cave, which broke policy and law as school board members are not to be briefed on the findings of any such investigation until a continuing contract licensed staff member's time to request a hearing on the outcome of an investigation has passed. This is because the board is the final decisionmaker on personnel matters involving hiring and firing, and the terms of employment. The investigation was heavily biased against Plaintiff as the only people interviewed were those that testified negatively about Davis. Plaintiff wasn't even interviewed or offered the opportunity to review and respond to the allegations. Based on the sham-natured and biased investigation, Defendant Shifflett told Plaintiff that he, Defendant Shifflett, intended to recommend to RCSB that Plaintiff be fired. Defendant Shifflett then represented to Plaintiff that he could alternatively resign with his reputation intact, and, depending on when he resigned, with some severance, which was false, because when Plaintiff tendered his resignation, RCSB rejected it and fired him.

118. Plaintiff's protected speech was a substantial factor in Defendants' decisions to investigate and terminate him as illustrated by the close temporal proximity between Plaintiff's speech and the advent of adverse action against him. Additionally, prior to Defendants kicking off the investigation against Plaintiff, Defendant Cross, the chair of the board, publicly stated he was displeased with the outcome of the trial and disapproved of anyone who participated in Davis' defense.

119. Defendants' actions would deter a person of ordinary firmness from engaging in similar protected activity.

120. As a proximate cause of Defendants' violation of Plaintiff's rights, Plaintiff has suffered economic loss, other compensatory damages, pain and suffering, mental anguish, emotional harm, embarrassment, personal humiliation and reputational harm.

## COUNT IV
Common-Law Wrongful Discharge in Violation of Public Policy
(*Bowman v. State Bank of Keysville*)
(Brought in the Alternative to Count V)
*(Against all Defendants)*

121. Plaintiff realleges and incorporates by reference all preceding paragraphs.

122. In *Bowman v. State Bank of Keysville*, 229 Va. 534, 540, 331 S.E.2d 797, 801 (1985), the Virginia Supreme Court recognized "a cause of action in tort . . . for improper discharge from employment." This common-law cause of action, now known as a "Bowman claim," lies for "retaliatory discharges . . . based on violations of public policy." *Id.*; *see Rowan v. Tractor Supply Co.*, 263 Va. 209, 213, 559 S.E.2d 709, 710 (2002).

123. "Virginia [also] recognizes a common law tort claim of wrongful discharge in violation of established public policy [under Bowman] against an individual who was not the plaintiff's actual employer but who was the actor in violation of public policy and who participated

in the wrongful firing of the plaintiff, such as a supervisor or manager." *VanBuren v. Grubb*, 284 Va. 584, 593, 733 S.E.2d 919, 924 (2012).

124. Plaintiff's employment was terminated after a trumped-up investigation by Defendants Shifflett, Cross, and Cave. With Defendant Shifflett's recommendation, Defendant RCSB and the individual Defendant board members rejected Plaintiff's resignation and fired him.

125. A "Type 1" Bowman claim arises when an employer terminates an employee for exercising a statutorily created right. *Rowan*, 263 Va. at 213-14. This type has been extended to include the termination of an employee for carrying out a statutory duty. *See Foster v. Fraternal Ord. of Eagles, Shenandoah Valley Aerie 4150, Inc.*, 108 Va. Cir. 409 (2021).

126. At all relevant times, Plaintiff possessed statutorily-created rights and duties, including without limitation:

a. A duty to testify truthfully under oath pursuant to Virginia Code § 18.2-434;

b. The right to be free from adverse action by an employer, including termination of employment, when subpoenaed to appear in court pursuant to Virginia Code § 18.2-465.1; and

c. A duty to attend a criminal case when a witness pursuant to Virginia Code § 19.2-267.

127. Defendants terminated Plaintiff for exercising his statutorily-created rights and carrying out his statutorily-created duties under the foregoing laws and regulations.

128. In the alternative, a "Type 2" Bowman clam arises when the public policy violated by Defendants in terminating Plaintiff is explicitly expressed in the statute and Plaintiff was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy. Here, the statutes cited above reflect that it is the public policy of Virginia to promote and prevent interference in the administration of justice by requiring truthful testimony under oath and the

attendance of witnesses at criminal trials and ensuring that witnesses are not retaliated against by their employers for testifying in court. As a witness called to testify truthfully pursuant to subpoena and an employee who was terminated as a result of his testimony, Plaintiff is a member of the class of persons entitled to protection by those public policies.

129. Defendants terminated Plaintiff's employment because he testified truthfully at a criminal trial after being subpoenaed to court by the defense. Defendants' conduct violated Plaintiff's right to be free from employer retaliation for testifying in court and fulfilling Plaintiff's duties to attend and testify truthfully at a criminal trial. As such, the termination of Plaintiff's employment constitutes wrongful termination under Virginia law.

130. In the alternative, Defendants' conduct violated Virginia public policy. As such, the termination of Plaintiff's employment constitutes wrongful termination under Virginia law.

131. As a direct and proximate result of Defendants' wrongful discharge, Plaintiff has suffered and will continue to suffer loss of employment, pecuniary loss, emotional pain, suffering, inconvenience, harm to reputation, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

132. At all times material hereto, Defendants Cave, Cross, and Shifflett engaged in the wrongful conduct described herein with actual malice or reckless indifference to the rights of Plaintiff, warranting an award of punitive damages.

COUNT V
Breach of Contract
(Brought in the Alternative to Count IV)
*(RCSB)*

133. Plaintiff realleges and incorporates by reference all preceding paragraphs, with the exception of those alleged in Count IV.

134. For good and valuable consideration, Plaintiff and Defendant RCSB entered into an employment contract that was in effect at the time of the termination of Kapuchuck's employment that implicitly included the rights afforded by Virginia Code § 2.2-304(B) ("Teachers employed after completing the probationary period shall be entitled to continuing contracts during good behavior and competent service.").

135. As such, Plaintiff could only be terminated for cause.

136. At all times during his employment, Kapuchuck engaged in good behavior and competent service.

137. Defendant RCSB breached the Contract by terminating Kapuchuck's employment without cause.

138. As alleged, Plaintiff's employment was terminated not for cause, but because he exercised his right to free speech and engaged in other acts protected under the law, and Defendants illegally retaliated against him for doing so.

139. As a direct and proximate result, Plaintiff has suffered and will continue to suffer direct and consequential pecuniary loss.

140. Plaintiff seeks damages caused by the breach of contract, costs, and post-judgment interest pursuant to Va. Code §§ 8.01-382, 6.2-302.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

A. Declare that the Defendant Rockingham County School Board's acts, omissions, policies, practices, customs, and conduct described herein violated Plaintiff's rights under the United States Constitution, including the Fourteenth and First Amendment;

B. Declare that the Defendants deprived Plaintiff of constitutionally protected liberty and property interests without due process of law;

C. Declare that the termination of Plaintiff's employment terminated the public policy of Virginia, or in the alternative, Plaintiff's employment contract;

D. Award Plaintiff compensatory damages in an amount to be determined at trial, including but not limited to:

a. Lost wages and salary;

b. Lost employment benefits;

c. Lost retirement and pension benefits, including diminution of Virginia Retirement System benefits;

d. Loss of future earning capacity;

e. Reputational harm;

f. Emotional distress, humiliation, embarrassment, anxiety, and related human damages;

E. Award Plaintiff reinstatement to a comparable educational administrative position, with restoration of all seniority, status, benefits, and associated employment rights, or, in the alternative, an award of front pay in lieu of reinstatement;

F. Award punitive damages against the individual Defendants, in their individual capacities, to the extent permitted by law;

G. Award Plaintiff reasonable attorneys' fees and costs;

H. Award pre-judgment and post-judgment interest as permitted by law;

I. Grant all other and further legal and equitable relief as this Court deems just, proper, and necessary.

Respectfully submitted,

JOSEPH KAPUCHUCK

*/s/ Brittany M. Haddox and Monica Mroz*
Brittany M. Haddox (VSB No. 86416)
HADDOX LAW
1203 Texas Street
Salem, VA 24153
Phone: 540-765-4284
Email: brittany@haddox.law

Monica L. Mroz (VSB No. 65766)
MONICA MROZ LAW, LLC
PO Box 3189
Roanoke, Virginia 24015
Phone: (540) 810-4745
Email: monica@mroz.legal

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of November 2026, the foregoing was filed using the Court's CM/ECF system, which sent notice of the same to all counsel of record.

*/s/ Brittany M. Haddox and Monica Mroz*